IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| BRIAN TWEEDY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | No. 5:11-cv-226 (CAR) |
| v. | : | |
| | : | |
| BIBB COUNTY SCHOOL DISTRICT | : | |
| and BOARD OF PUBLIC | : | |
| EDUCATION FOR BIBB COUNTY, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

### ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Brian Tweedy brings this employment discrimination action contending

his former employer, Defendant Bibb County School Board ("School Board")[1],

discharged him based on his race in violation of Title VII of the Civil Rights Act of 1964,

as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII").[2]  Before the Court is the Motion for

Summary Judgment [Doc. 22] filed by the School Board and the Board of Public

Education for Bibb County (the "Board of Education").   After fully considering the

---

[1] It is undisputed that the Bibb County School District and the Bibb County School Board are the same entity.
[2] Plaintiff also asserts Due Process claims under the Federal and Georgia Constitutions but concedes these claims are due to be dismissed.  Thus, the Court hereby **DISMISSES** these claims without further discussion.

matter, the Court finds Defendants are entitled to judgment as a matter of law, and their

Motion for Summary Judgment [Doc. 22] is therefore **GRANTED**.

**LEGAL STANDARD**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must

be granted "if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."[3]  A genuine issue of material

fact only exists when "there is sufficient evidence favoring the nonmoving party for a

jury to return a verdict for that party."[4]  Thus, summary judgment must be granted if

there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving

party or, in other words, if reasonable minds could not differ as to the verdict.[5]  When

ruling on a motion for summary judgment, the court must view the facts in the light

most favorable to the party opposing the motion.[6]

The moving party "always bears the initial responsibility of informing the

district court of the basis for its motion, and identifying those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, which it believes demonstrate the absence of a genuine issue of

---

[3] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[4] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).
[5] *See id.* at 249-52.
[6] *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

2

material fact" and that entitle it to a judgment as a matter of law.[7]  If the moving party

discharges this burden, the burden then shifts to the nonmoving party to go beyond the

pleadings and present specific evidence showing that there is a genuine issue of

material fact.[8]  This evidence must consist of more than mere conclusory allegations or

legal conclusions.[9]

## BACKGROUND

The School Board employed Plaintiff as a campus police officer from 2005 until

June 2009, when the School Board elected not to renew his employment contract,

thereby terminating his employment.  The School Board claims it terminated Plaintiff's

employment based on his unprofessional actions during two incidents in 2009. Plaintiff,

however, claims the School Board terminated his employment because he is African-

American.

January 2009 Incident

On January 13, 2009, Plaintiff, who worked as a campus police officer at Central

High School, received a call on the radio to assist Macon Police Department ("MPD")

Detective Terry Thomas (African-American) with an individual whom they suspected

---

[7] *Celotex Corp.,* 477 U.S. at 323 (internal quotation marks omitted).
[8] *See* Fed. R. Civ. P. 56(e); *see also Celotex Corp.,* 477 U.S. at 324-26.
[9] *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

of committing burglaries and causing other property damage at the school.[10]   Upon
Detective Thomas' request, Plaintiff took the suspect in custody and transported him to
the campus police office.[11]   Detective Thomas and School Board Investigator Richey
Kendrick (African-American) met Plaintiff at the office and took custody of the
suspect.[12]   While in Thomas's vehicle, the suspect asked to use the restroom, and
Thomas directed Plaintiff to take the suspect inside the office to the restroom.[13]   Once
inside the bathroom, Plaintiff removed the suspect's handcuffs, so the suspect could use
the facilities.[14] Because the suspect was not handcuffed, Plaintiff called for Thomas and
Kendrick to come and assist him, but neither Thomas nor Kendrick came to help.[15]

When Plaintiff attempted to put the handcuffs back on the suspect after he
finished using the restroom, the suspect tried to escape.[16]   Plaintiff "grabbed him and
[they] went to wrestling and fighting."[17]   While Plaintiff was "getting into a pretty big
scrap with this guy, [Plaintiff] pepper sprayed him.   [The suspect] was still fighting
trying to get away.   [They] fell out of the door of the [office]."[18] Plaintiff yelled for

---

[10] Pl. Depo., p. 41 [Doc. 25-1].
[11] *Id.* at p. 43.
[12] *Id.* at p. 44.
[13] *Id.* at p. 45-46.
[14] *Id.* at p. 46.
[15] *Id.* at p. 46-47.
[16] *Id.* at p. 47.
[17] *Id.*
[18] *Id.*

4

assistance from Thomas and Kendrick, who both came running.[19]  Kendrick held his asp baton out, and Plaintiff told Kendrick multiple times to hit the suspect.[20]  Kendrick, however, put the baton down, tackled the suspect, and they all tumbled down the stairs of the office.[21]  Plaintiff saw that the suspect was "about to get away," so he "got the asp baton and [] proceeded to give out strikes and give commands for [the suspect] to get on the ground and give us his hands."[22]  While Plaintiff was striking the suspect, Detective Thomas and Investigator Kendrick asked Plaintiff to stop hitting the suspect while they shielded the suspect.[23]  Plaintiff refused and continued to hit the suspect.[24]

Interim Chief of Campus Police Stephanie Prater (African-American), Plaintiff's supervisor, was present at the scene and witnessed Plaintiff strike the suspect several times.[25]  Chief Prater walked toward Plaintiff and told him to stop striking the suspect and give her the baton, but Plaintiff refused.[26]  She then yelled at Plaintiff to give her the baton; Plaintiff complied, and Chief Prater instructed him to go to her office.[27]  Plaintiff

---

[19] *Id.* at p. 47.
[20] *Id.* at p. 48.
[21] *Id.* at p. 48.
[22] *Id.* at p. 48.
[23] Prater Depo., p. 47 [Doc. 29].
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.*

estimates he struck the suspect seven or eight times.[28]  Plaintiff states he was injured during the altercation.

After the incident, Plaintiff was very upset with Detective Thomas and Investigator Kendrick "because they left [him]."[29]  During the meeting with Chief Prater, Plaintiff admits that he "was upset and Chief Prater said that [he] needed to calm down."[30]  Chief Prater brought each of the officers in her office, and Plaintiff stated he "cursed them out."[31]  As a result of Plaintiff's actions, Chief Prater disciplined Plaintiff for multiple violations of the Campus Police Policy Manual.  In her report, Chief Prater cited the following violations:

> 105.02 Insubordination – refused to relinquish asp baton when asked and refused to relinquish keys to another officer in the in the performance of his duty to assist. 105.03 Duty to Support Department and all Members Thereof, 105.05 Duty Regarding Conduct and 105.59 Conduct Unbecoming while On-Duty – Employee continually cursed out fellow officers both from our department and the Macon Police Department and criticized their performance to other departmental officers and in the presence of coworkers, namely communications personnel and other officers.[32]

---

[28] Pl. Depo., p. 48.
[29] *Id.*
[30] *Id.*
[31] *Id.* at p. 49.
[32] Classified Employee Notification & Documentation; Prater Depo., Ex. 1 [Doc. 29].

This disciplinary warning was Plaintiff's third warning for exhibiting this type of behavior.[33]  Chief Prater noted that Plaintiff exhibited "improper conduct on the job – Wantonly offensive conduct or language toward the public or School District officers or employees which has been documented as <u>progressive and consistent behavior</u>."[34]

As a result of his actions, Chief Prater sent Plaintiff to Mandatory EAP (Employee Assistance Program) and required him to attend anger management and pass a psychological screening for fitness for duty.  Chief Prater suspended him until these requirements were completed.  Plaintiff completed the requirements and returned to resume his duties as a campus police officer.

<u>April 2009 Incident</u>

Four months later, on April 15, 2009, Assistant Principal Jerry Flanders informed Plaintiff about a suspicious individual on school property whom Flanders suspected of selling drugs.[35]  When patrolling the campus, Plaintiff and Flanders witnessed the individual emerge from the back parking lot of the school and cross the street.[36]  When

---

[33] *Id.*
[34] *Id.* (emphasis added).
[35] Pl. Depo., p. 62-63.
[36] *Id.* at p. 63.

the individual noticed them, he ran away.[37]  Plaintiff chased him into a neighborhood

behind the school, but Plaintiff lost sight of him.[38]

As Plaintiff was walking back to the school campus, a former student at the high

school walked up behind Plaintiff and began cursing at Plaintiff not to run through his

yard.[39]  Plaintiff and the former student began arguing in the street.[40]  The former

student's brother walked up, and another officer arrived on the scene.[41]  Plaintiff stated

that the brothers threatened to get guns, and the encounter escalated to "a real heated

exchange."[42]  Two other campus police officers arrived on the scene, physically

removed Plaintiff, and drove him back to campus.[43]

Shortly thereafter, as Plaintiff entered his police car on campus to go home, the

brothers, along with two or three other individuals that were members in the Crips

gang, came on campus and began threatening Plaintiff.[44]  The other officers had already

left the scene, so Plaintiff was alone.[45]  Plaintiff states "they were all threatening to shoot

me and kill me and they were talking about they were going to come to my job and

---

[37] *Id.*
[38] *Id.* at p. 64/8-12.
[39] *Id.* at p. 64/13-21.
[40] *Id.* at pp. 64/21-22—65/1-12.
[41] *Id.* at p. 65/12-14.
[42] *Id.* at p. 67/6.
[43] *Id.* at p. 67/9-18.
[44] *Id.* at pp. 67/19-25—68.
[45] *Id.* at p. 68/8-9.

shoot me.  They were going to come to my house and kill me and all of this stuff there."[46]  Thus, Plaintiff shot pepper spray to get them off campus.[47]  One of the gang members then took his shirt off, threatened Plaintiff, and came towards him.[48]  Plaintiff took a stance indicating he would fight if necessary.[49]  The other officers, presumably having received information about the incident, arrived back on the scene, witnessing the escalation of the incident.[50]  One officer grabbed Plaintiff and told him to stop.[51]  Despite Plaintiff's requests, the officers did not arrest the individuals, and Plaintiff left the scene.[52]  The incident occurred on school campus while two or three hundred students were present outside.[53]

Chief Prater investigated the incident, taking statements from Plaintiff, the former student involved in the incident, and the officers who were present during the incident. Chief Prater noted that "the picture [the officers] described was yet another 'out of control' event with [Plaintiff]."[54] Indeed, all of the officers' statements were

---

[46] *Id.* at pp. 68-69.

[47] *Id.* at p. 69.

[48] *Id.* at p. 72.

[49] *Id.* at p. 73.

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.* at p. 81.

[54] Letter of Recommendation for Termination from Chief Prater to Dr. Dan Ray, Superintendent of Human Resources dated May 11, 2009, Prater Depo., Ex. 3 [Doc. 29].

"consistent with [Plaintiff's] prior behavior that was addressed on January 13, 2009."[55]

Chief Prater ultimately recommended Plaintiff's termination: "From these accounts and the others that I have on file concerning [Plaintiff's] aggressiveness toward the public and fellow officers, I have made the unfortunate decision to request termination of [Plaintiff's] employment with the Bibb County Board of Education."[56] Chief Prater stated the recommendation for termination

> [w]as based on the fact that [Plaintiff's] behavior had still not corrected itself from January and I felt it was a continuation of that type of behavior and that was conduct that was detrimental to the Department, that it also posed a threat and endangered the lives of other officers and that was unacceptable.[57]

Based on Chief Prater's recommendation, the School Board did not renew Plaintiff's contract, thereby terminating his employment.

Officer Matthew Geigler

Like Plaintiff, Matthew Geigler (Caucasian) was a Security Officer with Campus Police.   However, Geigler received multiple disciplinary actions but was not terminated.   From 2006 to 2009, Officer Geigler received four disciplinary actions regarding his duties on the job. In September 2006, Officer Geigler received a verbal

---

[55] *Id.*
[56] *Id.*
[57] Prater Depo., pp. 57-58.

warning for failure to report to work without having his leave properly authorized.[58]  In January 2007, he was disciplined for failure to report on time for duty.[59] In August 2007, Officer Geigler was suspended and put on probation for his continued "neglect of duty and inattentiveness to security concerns" when he failed to respond to a radio call and was found in the office using the internet.[60]   In November 2009, he was warned for being late to roll call.[61]

Officer Geigler also received three disciplinary actions for his actions involving students. In April 2009, Officer Geigler received a first warning "regarding physical confrontations with students"[62] after pulling a student's braids.[63] In May 2009, Officer Geigler was disciplined and relocated to a different school as a result of his use of physical force against a student during an arrest.  After a fight broke out between two rival gangs and the students had been dispersed, Officer Geigler stopped a student to talk to him about the fight and instructed the student to come to the office to speak with school administrators.  The student, however, refused.  When Giegler placed his hand on the student's arm to physically escort him to the office, the "student jerked away [],

---

[58] Record of Verbal Warning, Prater Depo., Ex. 5.
[59] Employee Counseling Record, Prater Depo., Ex. 4 [Doc. 29].
[60] Employee Counseling Record, Prater Depo., Ex. 6.
[61] Classified Employee Notification & Documentation, Prater Depo., Ex. 13 .
[62] Classified Employee Notification & Documentation, Prater Depo., Ex. 9.
[63] Prater Depo., p. 78/8-10 [Doc. 29].

began cursing, and shouted, 'You are not the police.'"[64]  The student then began to walk away and again refused to go with Geigler.   Thus, Geigler stepped in front of the student, put him to the ground, pushed his hand against the student's collarbone to gain control of the situation, then took hold of the student's shoulders and stood him up. The student continued to curse and struggle on the way to the office, and Geigler ultimately arrested him for disorderly conduct.[65]

The student complained of "police brutality."[66] After investigating the incident, however, Chief Prater determined that Officer Geigler's "involvement in this incident did not rise to the level of police brutality, [but his] actions . . . [did] necessitate a reminding about the procedures to follow when using force and the appropriate amount of force to use in a situation of this nature."[67] Later, in July 2009, Geigler was reprimanded for using offensive language toward a student on the bus, telling the student to "get off the bus before I drag your ass off the bus."[68]  Unlike Plaintiff, Geigler was not terminated.

---

[64] Letter of Concern and Investigation Results, Prater Depo., Ex. 10 [Doc. 29].

[65] *Id.*

[66] *Id*.

[67] *Id.*

[68] Classified Employee Notification & Documentation, Prater Depo., Ex. 12 [Doc. 29].

## DISCUSSION

Plaintiff claims Defendants terminated his employment because of his race in violation of Title VII. Title VII makes it unlawful for an employer to "fail or refuse to hire or [ ] discharge any individual, or otherwise [ ] discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race[.]"[69]

Claims of race discrimination based on circumstantial evidence, as is the case here, are evaluated under the burden-shifting framework developed in *McDonnell Douglas Corp. v. Green*.[70] First, a plaintiff must establish a prima facie case, or "facts adequate to permit an inference of discrimination."[71] If the plaintiff does so, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for its action.[72] If the employer meets this burden, the plaintiff then has an opportunity to show that the employer's proffered reasons for the adverse employment action were merely pretext for discrimination.[73]

---

[69] 42 U.S.C. § 2000e-2(a)(1).
[70] 411 U.S. 792 (1973).
[71] *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).
[72] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).
[73] *Id.* at 253.

13

**Prima Facie Case**

To establish a prima facie case of discriminatory discharge, Plaintiff must produce circumstantial evidence showing that he (1) is a member of a protected class; (2) he was qualified for the position; (3) suffered an adverse employment action; and (4) was treated less favorably than a similarly situated individual outside his protected class or was replaced by a person outside of his protected class.[74]   In this case, Plaintiff fails to establish his prima facie case of discriminatory discharge because he cannot point to a similarly situated comparator who was treated more favorably.[75]

"When a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated, [the Court must] evaluate whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways."[76]   A proper comparator is an employee outside of the plaintiff's protected class who is similarly situated to the plaintiff "in all relevant respects."[77]   If the comparator is not similarly situated in all relevant respects, "the different application of workplace rules does not constitute illegal discrimination."[78]

---

[74] *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).

[75] Plaintiff does not contend he can satisfy his prima facie case by showing he was replaced by someone outside his protected class.

[76] *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (quotation omitted).

[77] *Holyfield*, 115 F.3d at 1562.

[78] *Lanthem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999).

In determining whether a comparator is similarly situated to the plaintiff, the Eleventh Circuit has stated that "[t]he relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to different employment policies."[79]   However, "the quantity and quality of the comparator's misconduct must be nearly identical [to the plaintiff's] to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."[80] "The most important factors in a comparator analysis in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed."[81]

In an attempt to prove his prima facie case, Plaintiff points to Officer Geigler as a proper comparator who engaged in similar misconduct but received more favorable treatment.   The Court finds, however, that Officer Geigler is not a similarly situated individual who engaged in nearly identical misconduct to Plaintiff's.   Plaintiff was terminated as a result of his continued and repeated aggressive behavior towards the public and his fellow officers.   Plaintiff's misconduct included failing to stop beating a suspect upon direct orders from his supervisor; cursing out other officers; failing to hand over an asp baton upon direct orders from his supervisor; chasing a suspect who was no longer on school grounds through a public neighborhood; failing to diffuse a

---

[79] *Id.*
[80] *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir. 1999); *see also Burke-Fowler,* 447 F.3d at 1323.
[81] *Rioux v. City of Atlanta, Ga.,* 520 F.3d 1269, 1281 (11th Cir. 2008).

15

street confrontation with gang members; failing to stop when other officers arrived; and failing to diffuse a confrontation with gang members on school grounds in front of students.  Chief Prater stated clearly that Plaintiff was terminated because his "conduct was detrimental to the Department [and] that it also posed a threat and endangered the lives of other officers[.]"[82]

Officer Geigler, on the other hand, did not engage in misconduct posing a threat or endangering the lives of the public or other officers. Officer Geigler's relevant discipline resulted from his physical encounters and use of inappropriate language with students.  Specifically, Geigler's used offensive language to a student on the bus; pulled a student's braids; and forced a student onto the ground, pushing his hand against the student's collarbone—misconduct that is in no way "nearly identical" to that committed by Plaintiff.  Plaintiff argues that Geigler's actions could, indeed, be characterized as worse than Plaintiff's actions because they involved students.  Such decisions, however, must be left the employer, not the courts, to decide.  Indeed, "the quantity and quality of the comparator's misconduct must be nearly identical [to the plaintiff's] to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."[83]

---

[82] Prater Depo., p. 68.
[83] *Maniccia*, 171 F.3d at 1368 ; *see also Burke-Fowler*, 447 F.3d at 1323.

Because Geigler's misconduct is not similar to Plaintiff's, the disciplinary measures are not comparable for purposes of Title VII analysis; thus, Plaintiff cannot establish his prima facie case of discrimination, and Defendants are entitled to summary judgment.

**Pretext**

Even if Plaintiff had established his prima facie case of discrimination, Defendants are still entitled to summary judgment because Plaintiff cannot show that Defendant's legitimate, nondiscriminatory reason for termination is merely pretext for race discrimination. Defendant's legitimate reason for termination–Plaintiff's conduct occurring in January and April 2009–is one "that might motivate a reasonable employer,"[84] and therefore Defendant has satisfied its "exceedingly light" burden of producing a legitimate, non-discriminatory reason for Plaintiff's termination.[85]

Because Defendant has met its burden, Plaintiff must present sufficient evidence to create a genuine issue of material fact that Defendant's proffered legitimate reason for termination is merely pretext for race discrimination.  To establish pretext, a "plaintiff must demonstrate that the proffered reason was not the true reason for the

---

[84] *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).

[85] *See Vessels v. Atlanta Ind. Sch. Sys.*, 408 F.3d 763, 769-770 (11th Cir. 2005) (noting that employer's burden is exceedingly light and is satisfied as long as the employer articulates a clear and reasonable non-discriminatory basis for its actions).

employment decision. . . . [The plaintiff] may succeed in this <u>either</u> directly by persuading the court that a discriminatory reason more likely motivated the employer <u>or</u> indirectly by showing that the employer's proffered explanation is unworthy of credence."[86]  "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions."[87]   Evidence establishing pretext may include the same evidence initially offered to establish the prima facie case of discrimination.[88]

Plaintiff shows neither that Defendants' proffered reason for termination is unworthy of credence nor that a discriminatory reason motivated his termination.  The record reveals no "weaknesses, implausibilities, inconsistencies, or contradictions" in Defendants' rationale for Plaintiff's termination,[89] and Plaintiff fails to establish that any discriminatory animus motivated Chief Prater's recommendation to terminate him. While Plaintiff may have felt that his termination was unfair, this Court does not sit as a "super-personnel department," and it does not review the wisdom of an employer's business decisions, no matter how mistaken or unfair they may seem, as long as the

---

[86] *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (emphasis added) (quotations and citation omitted).
[87] *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (quotations and citation omitted).
[88] *Wilson v. B.E. Aerospace*, 376 F.3d 1079, 1088 (11th Cir. 2004).
[89] *See Holland v. Gee*, 677 F.3d 1047, 1055-56 (11th Cir. 2012).

action was not for a prohibited discriminatory reason.[90]  Without a similarly situated

comparator or any other sufficient evidence to support an inference of intentional

discrimination, Plaintiff has failed to establish his claim of racial discrimination, and

Defendant is entitled to judgment as a matter of law.

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment

[Doc. 22] is hereby **GRANTED**.


**SO ORDERED,** this 27th day of September, 2013.


S/  C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE

SSH/bbp

---

[90] *See Alvarez v. Royal Atlantic Dev., Inc.*, 610 F.3d 1253, 1266-67 (11th Cir. 2010).